**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| DEVON TINIUS, | ) | |
|  | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 21-0907 (ABJ) |
|  | ) | |
| LUKE CHOI, | ) | |
| *D.C. Metropolitan Police Officer, et al.*, | ) | |
|  | ) | |
| Defendants. | ) | |
|  | ) | |
|  | ) | |
| VICTOR AJOKUBI, | ) | |
|  | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 21-0909 (ABJ) |
|  | ) | |
| JOSE MANEECHAI, | ) | |
| *D.C. Metropolitan Police Officer, et al.*, | ) | |
|  | ) | |
| Defendants. | ) | |
|  | ) | |
|  | ) | |
| KELLY SMITH, | ) | |
|  | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 21-0986 (ABJ) |
|  | ) | |
| JERMAINE PEREZ, | ) | |
| *D.C. Metropolitan Police Officer, et al.*, | ) | |
|  | ) | |
| Defendants. | ) | |
|  | ) | |
|  | ) | |
| KENSY MARADIGA, | ) | |
|  | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 21-1460 (ABJ) |
|  | ) | |
| CARLIN KERN, | ) | |
| *D.C. Metropolitan Police Officer, et al.*, | ) | |
|  | ) | |
| Defendants. | ) | |
|  | ) | |

|  |  |
|---|---|
| HALEY SOUTHEE, )<br>            Plaintiff, )<br>    v.                        )<br>                              )<br> BRIANA VARGA )<br> *D.C. Metropolitan Police Officer*, *et al.*, )<br>                              )<br>            Defendants. )<br> | Civil Action No. 21-1461 (ABJ) |
| CHRISTOPHER GREEN, )<br>            Plaintiff, )<br>    v.                        )<br>                              )<br> CARLTON SMITH )<br> *D.C. Metropolitan Police Officer*, *et al.*, )<br>                              )<br>            Defendants. )<br> | Civil Action No. 21-2377 (ABJ) |
| BRANDON BROWN, )<br>            Plaintiff, )<br>    v.                        )<br>                              )<br> LUKE CHOI, )<br> *D.C. Metropolitan Police Officer*, *et al.*, )<br>                              )<br>            Defendants. )<br> | Civil Action No. 22-0441 (ABJ) |

## <u>MEMORANDUM OPINION</u>

Plaintiffs in this set of seven consolidated cases were each arrested for violating a city-wide curfew while "protesting the treatment of African American citizens by the police" during the summer of 2020. Compl. [Dkt. # 1-2] ¶ 8.[1] They brought actions against their arresting officers

---

1    The Court has reviewed the pleadings in each case and has determined that they are substantially identical. Unless otherwise indicated, docket citations in this opinion are to the pleadings in the first of the seven cases filed: *Tinius v. Choi*, No. 21-907.

from the D.C. Metropolitan Police Department ("MPD") and against the District of Columbia, alleging that the individual officers arrested them without probable cause, committed assault and battery, and violated their First, Fourth, and Fourteenth Amendment rights, and that the District is vicariously liable for its employees' torts. Compl. ¶ 13. Defendants filed motions to dismiss the complaints pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Defs.' Mot. to Dismiss Compl. [Dkt. # 7] ("Mot."). On November 10, 2021, the Court consolidated the cases for consideration of the dispositive motions. Min. Order (Nov. 10, 2021).[2] The matter is fully briefed. *See* Pl.'s Opp. to Mot. [Dkt. # 12] ("Opp."); Defs.' Reply to Opp. [Dkt. # 16] ("Reply"); Pl.'s Reply to Defs.' Reply [Dkt. # 17] ("Surreply").

In their oppositions to the motions to dismiss, plaintiffs complained that the curfew at issue "was and is vague and overly broad," Opp. at 1, and the Court then ordered plaintiffs to identify "which count or counts in the complaint challenge the curfew on the specific grounds that it is void for vagueness and in which paragraphs in each count that can be found." Min. Order (Dec. 9, 2021). In response, each plaintiff filed a motion to amend their complaint, *see, e.g.*, Pl. Devon Tinius' Mot. for Leave to Amend her Compl. [Dkt. # 25] ("Mot. to Amend"), which defendants have opposed on the grounds that amendment would be futile. *See* Defs. Consolidated Opp. to Mot. to Amend [Dkt. # 27] ("Opp. to Mot. to Amend") at 1. Because even the proposed amended complaints fail to state a claim upon which relief can be granted, the Court will **DENY** the motions for leave to amend and **GRANT** the motions to dismiss.

---

2       The seventh case, *Brown v. Choi*, No. 22-cv-441, was consolidated pursuant to the parties' agreement in a minute order docketed in that case on March 15, 2022.

**BACKGROUND**

## I.    Factual Background

On the evening of June 1, 2020, plaintiffs took to the streets of the District of Columbia to participate in the widespread demonstrations and protests that followed the murder of George Floyd by Derek Chauvin, a former police officer.  *See* Plaintiff Devon Tinius' Am. Complaint, Ex. 1 to Mot. to Amend [Dkt. # 25-1] ("Proposed Am. Compl.") ¶ 7 ("Plaintiff was shouting 'Black Live[s] Matter' and saying the names of individuals that plaintiff believed had been killed by police officers without legal justification such as George Floyd and Breonna Taylor.").[3]  On that day, though, the Mayor of the District of Columbia, Muriel Bowser, had announced the extension of a curfew put in place the night before.  *See* Mayor's Order 2020-069 (June 1, 2020), Ex. 1 to Mot. [Dkt. # 7-1] ("Mayor's Order," "curfew," or "June 1 Order") at 1;[4] *see also* Mayor's Order 2020-068 (May 31, 2020), Ex. 2 to Mot. [Dkt. # 7-2] ("May 31 Order").[5]

The June 1 Order stated:

> For the past several nights, our police, firefighters, and members of the public safety team for Washington, DC . . . have been working to make sure people may exercise their First Amendment rights, while not defacing,

---

3    Though the alleged facts in the proposed amended complaint are virtually identical to the facts in the original complaint, the numbering of the paragraphs is slightly different, and the Court will cite the proposed amended complaint throughout the opinion for simplicity's sake.

4    The original curfew ordinance is located on the D.C. Mayor's website, at https://mayor.dc.gov, and a PDF version of the Mayor's Order is located at https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachments/Mayor%27s%20Order%202020-069.pdf.  The curfew is incorporated in the complaints at numerous points, and the parties do not dispute the substance of the ordinance.

5    The Court takes judicial notice of this public document, as it was explicitly incorporated as part of the challenged ordinance.  *See* Mayor's Order at 1 ("The findings of Mayor's Order 2020-068, dated May 31, 2020, are incorporated herein.").  A PDF copy of the May 31, 2020 Order is also located on the D.C. government website, dcregs.dc.gov, located at dcregs.dc.gov/common/NoticeDetail.aspx?noticeID=N0093754 (click on "View text").

> damaging, or destroying churches, monuments, parks, businesses, and government offices in Washington, DC.
>
> In multiple areas throughout the District of Columbia, numerous businesses, vehicles, and government buildings have been vandalized, burned, or looted.  More than eighty (80) individuals were arrested over the past two (2) days in connection with these incidents, with the majority charged with felonies.
>
> On the night of May 31, 2020, looting and vandalism occurred at multiple locations throughout the city, in addition to the rioting in the downtown area.  Vandals smashed windows in Northeast DC, upper Northwest DC stretching to Georgetown, and caused extensive damage in the Golden Triangle Business Improvement District, Downtown DC Business Improvement District, and Mount Vernon Triangle Community Improvement District.  Rioting and looting affected the operations of District government agencies.

Mayor's Order at 1–2.

The order incorporated the findings of the order issued the day before.  The May 31 order had also established a curfew – from 11 p.m. on Sunday, May 31 through 6:00 am on June 1 – and it announced:

> Washington, DC, is the proud host of demonstrations and peaceful protests, and as Mayor of Washington, DC, I am proud of our city.
>
> For the past two nights, our police, and firefighters, and members of the public safety team for Washington, DC, along with our federal partners, have been working to make sure people may exercise their First Amendment rights, while not destroying Washington, DC.
>
> I recognize and empathize with the outrage that people feel following the murder of George Floyd in Minnesota last week.  We are grieving hundreds of years of institutional racism – systems that require Black Americans to prove their humanity, just for it to be disregarded.
>
> In the downtown area of the District of Columbia, numerous businesses and government buildings were vandalized, burned, or looted.  Over the past nights, there has been a glorification of violence, particularly during later hours of the night.  This violence is not representative of peaceful protest or individuals exercising their lawful First Amendment rights.

5

> The health, safety, and well-being of persons within the District of
> Columbia are threatened and endangered by the existence of these violent
> actions.

May 31 Order at 1–2.

In addition, the Mayor noted in both orders that the District was "under a declared public health state of emergency due to COVID-19."  Mayor's Order at 2; *see also* May 31 Order at 2 ("Many protesters are not observing physical distancing requirements and many protesters are not wearing masks or face coverings, putting the public health at further risk.").  The June 1 Order identified specific locations where "rioting" and "looting and vandalism occurred," and it "impose[d] a new curfew, in order to protect the safety of persons and property in the District." Mayor's Order at 2.

The new curfew was to be in effect from 7:00 p.m. on Monday, June 1 through 6:00 a.m. on June 2, and again from 7:00 pm on the evening of Tuesday, June 2 through 6:00 a.m. on June 3, 2021.  Mayor's Order at 2.  The order specified that "[d]uring the hours of the curfew, no person . . . shall walk, bike, run, loiter, stand or motor by car or other mode of transportation upon any street, alley, park, or other public place within the District."  Mayor's Order at 2.  Any person found in violation of the order was subject to a three-hundred dollar fine ($300) or imprisonment for not more than ten (10) days.  Mayor's Order at 3.[6]

Plaintiffs acknowledge in their complaints that they were standing in a public place well after 7:00 p.m. on June 1.  *See* Proposed Am. Compl. ¶ 7 (plaintiffs were protesting "at approximately 11:00 p.m.").  However, they allege that "[p]rior to the time that [they were]

---

6       Exemptions were provided for:  (1) essential workers, such as "healthcare personnel" who were "engaged in essential functions"; (2) individuals who were voting and participating in election-related activities; and (3) those traveling to a hospital or urgent care facility.  Mayor's Order at 2.

arrested, plaintiff[s] had attempted to leave the area and to return home in compliance with the curfew law, but [were] prevented from doing so" by members of MPD "who continually blocked the path of the demonstrators and refused to allow them to leave." Proposed Am. Compl. ¶ 8.[7] All plaintiffs were handcuffed and arrested, transported to the Blue Plains Police Academy, and "held with [their] hands handcuffed behind [their] back[s] until [they were] arraigned and released the next morning." Proposed Am. Compl. ¶ 9. By October 2020, all charges against the plaintiffs had been dismissed. Proposed Am. Compl. ¶ 10.

## II. The Complaints

Each complaint consists of the same eight counts:

- Count I, against the individual officers and the District, asserts the common law tort of false arrest, alleging that plaintiffs were arrested "without legal justification." Proposed Am. Compl. ¶ 17.

- Count II, against the officers and the District, asserts the common law tort of assault, alleging that the defendant police officers caused plaintiffs to reasonably apprehend that they would be subjected to imminent harmful and offensive contact. Proposed Am. Compl. ¶ 22.

- Count III, against the officers and the District, asserts the common law tort of battery, alleging that the defendant police officers touched plaintiffs without their consent and "without having legal justification for doing so." Proposed Am. Compl. ¶ 27.

- Count IV is brought under 42 U.S.C. § 1983 against the individual officers only, and it asserts that plaintiffs were arrested without probable cause in violation of the Fourth Amendment. Proposed Am. Compl. ¶ 31.

- Count V, brought against the officers under 42 U.S.C. § 1983, asserts that the officers used excessive force when arresting plaintiffs in violation of the Fourth Amendment. Proposed Am. Compl. ¶ 34.

---

7       The complaints in each of the seven cases repeat the same factual allegations on behalf of each plaintiff and contain no specific information concerning any interaction between an individual officer and an individual plaintiff.

- Count VI, brought against the officers under 42 U.S.C. § 1983, alleges that plaintiffs' arrests violated their First Amendment right to freedom of speech.  Proposed Am. Compl. ¶ 38.

- Count VII, brought against the officers under 42 U.S.C. § 1983, alleges that plaintiffs' arrests violated their First Amendment right of freedom of assembly.  Proposed Am. Compl. ¶ 42.

- Count VIII, brought against the officers under 42 U.S.C. § 1983, alleges that plaintiffs' arrests violated the Equal Protection Clause of the Fifth and Fourteenth Amendments. Proposed Am. Compl. ¶ 46.

### III.    Proposed Amendment

The proposed amended complaints would not include any new factual allegations, but plaintiffs seek to add paragraphs expanding upon their legal theories.[8]  The changes would be:

- Paragraph seven – which had alluded to plaintiffs' overbreadth and vagueness theories – would be deleted, and the theories would be included in two new paragraphs.  *Compare* Compl. ¶ 7 *with* Proposed Am. Compl. ¶¶ 12–13.

- Proposed paragraph twelve would state, "[t]he curfew law issued by Mayor Bowser on June 1, 2020 is unconstitutional because it is vague," and explain the legal theory.  *See* Proposed Am. Compl. ¶ 12 ("The term loitering is vague because . . .").

- The new paragraph thirteen would state, "[t]he District of Columbia's Curfew law was unconstitutional because it was overbroad."  Proposed Am. Compl. ¶ 13. Proposed paragraph thirteen then explains the legal theory.  *See* Proposed Am. Compl. ¶ 13 ("The . . . curfew law was overbroad because . . .").

- Proposed paragraph nine alleges that "plaintiff was transported to the Blue Plain Police Academy where plaintiff was held with plaintiff's hands behind plaintiff's back until plaintiff was arraigned and released the next morning."  Proposed Am. Compl ¶ 9.  This is substantially similar to Compl. ¶ 10, but proposed paragraph nine would also add a new sentence:  "[t]his conduct was clearly excessive because Officer Choi had no legal justification for touching plaintiff and also because plaintiff was held overnight with plaintiff's hands handcuffed behind plaintiff's back."  Proposed Am. Compl. ¶ 9.

---

8    There are some additional minor changes that are not noted here because they are either stylistic, *e.g.*, changes to capitalization or phrasing, or simply appear to be typos.

▪ Adding sentences to Counts I and IV (arrest without probable cause), III (battery), V (excessive force), VI (freedom of speech), and VII (freedom of assembly) asserting that each of those claims is predicated on the vagueness and overbreadth theories. *See e.g.*, Proposed Am. Compl. ¶ 17 (the curfew law upon which the arresting officer was relying was "void because it was unconstitutional because it was vague and overbroad"); *see also* Proposed Am. Compl. ¶¶ 18, 26, 27, 31, 34, 38, and 42.

## STANDARD OF REVIEW

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." 556 U.S. at 678. And "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id*. at 679.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id*., quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

When considering a motion to dismiss under Rule 12(b)(6), the Court is bound to construe a complaint liberally in the plaintiff's favor, and it should grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nevertheless, the Court need not accept inferences drawn by

the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *See id.*; *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citations omitted).

Federal Rule of Civil Procedure 15(a)(2) provides that a party may amend its pleading with the court's leave, and that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The Supreme Court has emphasized this standard: "In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962). But a court "may deny a motion to amend a complaint as futile if the proposed claim would not survive a motion to dismiss." *Hettinga v. United States*, 677 F.3d 471, 480 (D.C. Cir. 2012).

## ANALYSIS

### I.   Plaintiffs' Constitutional Claims

Since federal subject matter jurisdiction in these cases is predicated on the claims brought under 42 U.S.C. § 1983, the Court will consider them first.[9]

---

9       Paragraph four of the complaints alleges that the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, but that provision would not necessarily supply a basis for hearing the pendent common law tort claims in Counts I, II, and III if the federal claims were dismissed. Proposed Am. Compl. ¶ 4.

Section 1983, enacted as part of the Civil Rights Act of 1871, provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

Thus, "[t]o state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

The section 1983 claims are brought against the individual police officer defendants only. Proposed Am. Compl. ¶¶ 30–47. In their motions to dismiss, defendants assert that the police officers are shielded from liability because they are entitled to qualified immunity. *See* Mot. at 5–7. Determining whether an official is afforded qualified immunity is a two-step inquiry. First, the threshold question is: "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, the Court must determine whether "the right was clearly established." *Id.*; *Lederman v. United States*, 291 F.3d 36, 46 (D.C. Cir. 2002).

The question of whether a right is "clearly established" involves an analysis of "whether the Supreme Court, the District of Columbia Circuit, and, to the extent that there is a consensus, other circuits have spoken clearly on the lawfulness of the conduct at issue." *Butera v. Dist. of Columbia*, 235 F.3d 637, 652 (D.C. Cir. 2001). In other words, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 635 (1987). If it would "'be clear to a reasonable

11

officer that his conduct was unlawful in the situation he confronted,'" the right is considered clearly established. *Groh v. Ramirez*, 540 U.S. 551, 563 (2004), quoting *Saucier*, 533 U.S. at 202. "Although 'this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.'" *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

The Supreme Court recently reiterated the importance of this principle:

> We have repeatedly told courts not to define clearly established law at too high a level of generality. It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

*City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (per curiam) (citations and internal quotation marks omitted).

This Court is "permitted to exercise [its] sound discretion" in deciding which of the two *Saucier* prongs should be addressed first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). But the Supreme Court has emphasized "that it is often beneficial" to answer the predicate constitutional question, as it "promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." *Id.* The Court has encouraged trial courts to resolve qualified immunity issues "at the earliest possible stage of litigation." *Id.* at 232, quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam).

### A. <u>Counts VI and VII – The First Amendment Claims</u>

Counts VI and VII allege that the arresting officers are liable under 42 U.S.C. § 1983 because they infringed upon plaintiffs' First Amendment rights to freedom of speech and freedom of assembly. Proposed Am. Compl. ¶¶ 36–43.

Plaintiffs allege "[d]efendant police officer[s] knowingly deprived plaintiff[s] of [their] First Amendment Right to freedom of speech" when they arrested plaintiffs pursuant to the curfew ordinance.  Proposed Am. Compl. ¶ 38; *see also* Proposed Am. Compl. ¶ 42 ("[d]efendant police officer[s] knowingly deprived plaintiff[s] of [their] First [A]mendment Right to lawful assembly").

The First Amendment prohibits, among other things, laws "abridging the freedom of speech . . . or the right of the people peaceably to assemble." U.S. Const. amend. I.  The Supreme Court has determined that this restriction applies not only to Congress but also to municipal governments. *Lovell v. City of Griffin*, 303 U.S. 444, 450–51 (1938).  However, a city government "may sometimes curtail speech when necessary to advance a significant and legitimate state interest." *Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984), citing *Schenck v. United States*, 249 U.S. 47, 52 (1919).  And it is well-established that "[e]xpression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions." *Clark v. Cmty. for Creative Nonviolence*, 468 U.S. 288, 293 (1984). "[R]estrictions of this kind are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Id.*, citing *United States v. Grace*, 461 U.S. 171, 177 (1983) and *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46 (1983); *see also Cmty. for Creative Non-Violence v. Kerrigan*, 865 F.2d 382, 390 (D.C. Cir. 1989).

Determining the standard of review to be applied in this case, though, depends upon a preliminary assessment of whether the ordinance involved is in fact a restriction on expression, or whether it merely regulates conduct.

13

The Supreme Court has consistently recognized a distinction between content-based laws that must satisfy strict scrutiny, *see, e.g.*, *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163–64 (2015), and those that are intended to further other governmental interests but have an incidental impact on expressive activity. In *United States v. O'Brien,* 391 U.S. 367 (1968), the petitioner and three others burned their draft cards on the steps of the South Boston Courthouse, and O'Brien challenged his criminal conviction for willfully and knowingly destroying a Selective Service registration certificate on First Amendment grounds. *Id.* at 369–70. The Court reviewed its prior rulings on expressive conduct and explained:

> This Court has held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* at 376–77 (internal citations omitted). The Court observed that the law in question "deals with conduct[,] having no connection with speech," and it "no more abridges free speech on its face than a motor vehicle law prohibiting the destruction of drivers' licenses, or a tax law prohibiting the destruction of books and records." *Id.* at 375. But given its application to an expressive act on O'Brien's part, and the indication in the legislative history that the statute was intended, at least in part, to stem this form of protest, *id.* at 385–86, the Court applied the test for regulations that impose an incidental burden on expressive conduct and ruled that O'Brien's conviction did not offend the Constitution. *Id.* at 386.

After *O'Brien*, the Supreme Court emphasized that an activity affected by a generally applicable governmental regulation must have "a significant expressive element" to warrant First Amendment protection. *See Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 706–07 (1986). In *Arcara*, the district attorney brought an action under a New York public nuisance statute to shut down an adult bookstore, alleging that the owners were aware that the solicitation of prostitution and sexual activity were occurring openly on the premises. *Id.* at 698–99. The owners of the store opposed the action on First Amendment grounds, arguing that the closure of the establishment would interfere with their First Amendment right to sell books. *Id.* at 700. The New York Court of Appeals held that it was necessary to analyze the regulation under the *O'Brien* test because the closure order would impose an incidental burden on the owners' bookselling activities. *Id.* at 701. But the Supreme Court disagreed and distinguished the circumstances before it from the symbolic draft card burning in *O'Brien*. *Id.* at 705. It explained that the Court had subjected governmental restrictions to scrutiny in the past "only where it was conduct with a significant expressive element that drew the legal remedy in the first place, as in *O'Brien*, or where a statute based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity." *Id.* at 706–07. It found that the legislation resulting in the closure of the store was directed at conduct that had nothing to do with expression, and it was not moved by the fact that the implementation of the provision could have "some conceivable burden" on First Amendment activities. *Id.*

Thereafter, though, in *Ward v. Rock against Racism,* 491 U.S. 781 (1989), the Court took up a regulation that "require[d] bandshell performers to use sound-amplification equipment and a sound technician provided by the city." *Id.* at 784. This was an "attempt to regulate the volume of amplified music at the bandshell." *Id.* But the regulation effectively prevented the plaintiff

from using the bandshell to broadcast its message, and the Supreme Court "granted certiorari to clarify the legal standard applicable to governmental regulation of the time, place, or manner of protected speech." *Id.* at 789 (citation omitted). The Court reiterated that when a law restricts protected speech, it "must be narrowly tailored to serve the government's legitimate, content-neutral interests," but it also explained that it "need not be the least restrictive or least intrusive means of doing so." *Id.* at 798.

Given those precedents, the D.C. Circuit concluded that a District of Columbia law imposing a permanent curfew on juveniles did not regulate expressive conduct at all, and therefore, it was not subject to First Amendment scrutiny.

> [T]he curfew does not itself regulate or proscribe expression, and thus would only be subject to scrutiny under the First Amendment if it regulated "conduct that has an expressive element," or if it "impose[d] a disproportionate burden upon those engaged in protected First Amendment activity." The curfew regulates the activity of juveniles during nighttime hours; it does not, by its terms, regulate expressive conduct. Nor can the curfew, on its face, be said to burden disproportionately those engaged in expressive conduct—the curfew covers all activities and provides a specific defense for juveniles engaged in First Amendment activities.

*Hutchins v. Dist. of Columbia*, 188 F.3d 531, 548 (D.C. Cir. 1999), quoting *Arcara,* 478 U.S. at 703–04.[10]

The government suggests that the curfew in this case is simply intended to control conduct as well, and it argues that the less stringent rational basis test should be applied in this case. *See* Reply at 2, citing *United States v. Chalk*, 441 F.2d 1277, 1281 (4th Cir. 1971). *Chalk* involved a local proclamation declaring a state of emergency during a time of unrest, and the Fourth Circuit

---

[10]    The Court of Appeals did subject the juvenile curfew to intermediate scrutiny, but that was based on the allegation that the curfew restricted other fundamental rights. *Hutchins*, 188 F.3d at 541.

reviewed *O'Brien* and other precedents and accurately observed that "[t]he standard [that] has developed where regulation of conduct has an incidental effect on speech is that the incidental restriction on First Amendment freedoms can be no greater than is essential to the furtherance of the government interest which is being protected." 441 F.2d at 1280. But then *Chalk* went further, stating that "the scope of our review in a case such as this must be limited to a determination of whether the mayor's actions were taken in good faith and whether there is some factual basis for [her] decision that the restrictions [s]he imposed were necessary to maintain order." *Id.* at 1281. The D.C. Circuit has not adopted the *Chalk* formulation, though, and it has not spoken directly to this issue.[11]

The Order in this case prohibited people from walking, biking, running, loitering, standing, or driving on "any street, alley, park, or other public place within the District." Mayor's Order at 2. It thereby prevented them from engaging in the public protests described in the Order itself during the hours the curfew was in effect. One could argue that because the curfew is directed at a broad swath of pure conduct, and it does not have "the inevitable effect of singling out those engaged in expressive activity," *Arcara*, 478 U.S. at 707, it is not a restriction on expression at all and need not satisfy a higher level of scrutiny. But the curfew was enacted in the specific context of ongoing public protests and counter-protests, and it is plain on the face of the ordinance that the Mayor was endeavoring to balance First Amendment concerns and public safety under temporary, exigent circumstances. Moreover, there is no exception for First Amendment activities as in the *Hutchins*

---

11      In the Court's view, the *Chalk* opinion is of little utility here. Those defendants were charged with possessing prohibited firearms, as well as the makings of an incendiary bomb, after their car was stopped for a curfew infraction and searched. 441 F.2d at 1279. Defendants challenged the legality of the stop on the basis that the curfew was overbroad and constitutionally infirm. *Id.* at 1280. The court upheld the mayor's exercise of emergency powers, but the case did not involve the application of the curfew to individuals engaged in First Amendment expression.

curfew, and the Mayor's Order was invoked here to stop the plaintiffs from engaging in protected activities during particular times in particular places.  Therefore, the situation is more akin to *Rock Against Racism* than *Hutchins* or *Arcara,* and the Court will decline to apply the more deferential standard of review described in *Chalk*.[12]  Even if the Court were inclined to say that the Order was not a pure time, place, and manner restriction directed *towards* speech, but it merely had the incident *effect* of curtailing speech, the Supreme Court has made it clear that "the *O'Brien* test 'in the last analysis is little, if any, different from the standard applied to time, place, or manner restrictions.'"  *Rock Against Racism*, 491 U.S. at 798, quoting *Clark*, 468 U.S. at 298.

Therefore, in an abundance of caution, the Court will follow the approach in *Rock Against Racism,* and apply the well-established test for time, place, and manner restrictions.[13]  The Court notes that other district courts faced with similar ordinances have also applied the standard set forth in *Rock Against Racism*.  *See, e.g.*, *Sasso v. City of Dallas*, No. 20-cv-1398, 2020 WL 2839217, at *3 (N.D. Tex. June 1, 2020) (stating the test is whether ordinances "are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information."), quoting *Rock Against Racism*, 491 U.S. at 791;

---

12      Moreover, "to the extent it articulates a more deferential test, *Chalk* matters only if [the] curfew failed the ordinary rule," and, as explained below, this curfew passes intermediate scrutiny under *Rock Against Racism*.  *See Larson v. City of Minneapolis*, No. 21-cv-714, 2021 WL 4895275, at *7 (D. Minn. Oct. 20, 2021) ("The Eighth Circuit has not addressed this question, but for purposes of this case, it makes better sense just to apply ordinary constitutional analysis.  If Mayor Frey's curfew didn't violate the First Amendment according to the usual standards, then it didn't violate the more deferential approach under *Chalk*.").

13      The DC Circuit has differentiated the time, place, and manner standard from what has been referred to as "intermediate scrutiny," suggesting that the former is a more stringent standard.  *See Hutchins*, 188 F. 3d at 541 ("To withstand intermediate scrutiny, the curfew must be 'substantially related' (rather than narrowly tailored) to the achievement of 'important' (rather than compelling) government interests."), citing *Craig v. Boren,* 429 U.S. 190, 197 (1976) and *Mississippi University for Women v. Hogan,* 458 U.S. 718, 724 (1982).

*NAACP of San Jose/Silicon Valley v. City of San Jose*, No. 21-cv-1705, 2021 WL 4355339 (N.D. Cal. Sept. 24, 2021), at *11 ("to be constitutional, those restrictions must be: (1) 'without reference to the content of the regulated speech,' i.e., content neutral, (2) 'narrowly tailored to serve a significant government interest,' and must (3) 'leave open ample alternative channels for communication of the information.'"), quoting *Rock Against Racism*, 491 U.S. at 791.[14]

The first question to be considered, then, is whether the curfew was content-neutral. "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Rock Against Racism*, 491 U.S. at 791. Thus, the "government's purpose is the controlling consideration." *Id.*; *see also id.*, quoting *Clark*, 468 U.S. at 293 ("Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'"). Moreover, "a regulation that

---

14      Plaintiffs argue that strict scrutiny applies, and they cite a 1978 Ohio state court decision and a 1992 Maryland state court opinion as support. *See* Opp. at 4, citing *In re Mosier*, 59 Ohio Misc. 83, 89 (Common Pleas Ohio 1978) and *Brown v. Ashton*, 611 A.2d 599, 606 (Md. Ct. Spec. App. 1992); *see also* Surreply at 3–4. Of course, this Court is not bound by state court opinions, but plaintiffs' failure to grapple with Supreme Court precedent is a more significant problem. It is true that the *In re Mosier* opinion endeavored to summarize the state of Supreme Court case law at the time, but it did so as of 1978, and this Court must follow the case law that has developed since then, such as *Arcara*, *Rock Against Racism*, *Clark*, and their progeny. Furthermore, the intermediate appellate decision in *Brown* that plaintiffs would have this Court follow was vacated by the Court of Appeals of Maryland, *see Ashton v. Brown*, 660 A.2d 447, 455 (1995) ("the judgment of the circuit court must be vacated"), which then found that "the ordinance violate[d] both the Due Process Clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights" without mentioning strict scrutiny. *Id.* Finally, plaintiffs insist in their surreply that "time, place, and manner" analysis should not be applied to the Mayor's Order because "the curfew law at issue in this case has the effect of blocking all speech entirely. . . . [I]f a person cannot be in public, it is axiomatic that there will be no opportunity to speak in public." Surreply at 3. But this completely ignores the word "time" in the phrase "time, place, and manner." While the curfew prohibited plaintiffs from being in public during certain hours, they were free to engage in the protected activities at other times.

serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* at 791.

Plaintiffs have not alleged that the Mayor enacted this curfew "because of" disagreement with the message they wished to spread. Indeed, the order – which took pains to "recognize" and "empathize" with the message – is quite explicit: the curfew was enacted to ensure public safety and protect property after several nights of vandalism, fires, and looting, and to reduce crowds during the pre-vaccine period of the pandemic. Mayor's Order at 1–2. Nor have plaintiffs argued in their oppositions that the order was directed at the content of any covered expression. *See generally* Opp. This is a content-neutral regulation.

The second question is whether the curfew was narrowly tailored to serve a significant government interest. *Clark*, 468 U.S. at 293. As defendants have noted, "public safety and the prevention of a pandemic are significant governmental interests, and Plaintiff does not contend otherwise." Reply at 3. Both interests are well-established; "[i]t is a traditional exercise of the States' police powers to protect the health and safety of their citizens." *Hill v. Colorado*, 530 U.S. 703, 715 (2000) (internal quotation marks omitted). The curfew was directly tied to these interests: it identified the areas where damage had been sustained ("[v]andals smashed windows in Northeast DC, upper Northwest DC stretching to Georgetown, and caused extensive damage" throughout downtown areas); it noted the continued health threat posed by COVID-19 ("the District continues to be under a declared public health state of emergency due to COVID-19"); and it announced that the Mayor was exercising her "authority to impose a new curfew, in order to protect the safety of persons and property in the District." *See* Mayor's Order at 2. The Mayor added that "[t]he health, safety, and well-being of persons within the District of Columbia are threatened and endangered by the existence of these violent actions." *Id.* Based on this record, and in the absence of any

20

argument from plaintiffs to the contrary, the Court is satisfied that the order served significant governmental interests in health and safety. *See also Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) ("Stemming the spread of COVID–19 is unquestionably a compelling interest.").

As for the third prong of the test, plaintiffs argue that the curfew was not narrowly tailored and that it left insufficient alternative channels available for the expression of ideas. Surreply at 4. But time, place, manner restrictions "are not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.'" *Rock Against Racism*, 491 U.S. at 797, quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985). The Court does not have to agree with "the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted"; "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest, [] the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 800 (internal quotation marks and citation omitted); *see also White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1529 (D.C. Cir. 1984) ("[I]t is not the province of the court to 'finetune' the regulations so as to institute the single regulatory option the court personally considers most desirable.").

Here, the Court finds that the order was appropriately tailored and not broader than necessary since it was limited to the nighttime hours, and it was put in place for two nights only. Moreover, the efforts to combat looting, arson, and vandalism "would be achieved less effectively absent the regulation." *Rock Against Racism*, 491 U.S. at 799. The behavior the curfew was meant to stem had been prevalent "particularly during later hours of the night." May 31 Order at 1. On

May 31, the Mayor attempted a less restrictive option with a shorter time frame, and the June 1 order reported that, unfortunately, the "looting and vandalism," along with "smashed windows," in neighborhoods ranging from "Georgetown," "the Golden Triangle Business Improvement District, Downtown DC Business Improvement District, and Mount Vernon Triangle Community Improvement District," had continued the night before. Mayor's Order at 2. Thus, the connection between the hours the curfew was in force and the interest it was meant to further – reducing violence and the risk to people and property – is clear.

That justification alone is sufficient to support the order. But while the connection between preventing the spread of COVID-19 and the curfew is more tenuous, the Order did serve that purpose as well. On May 31, the Mayor expressed serious concerns: "[m]any protesters are not observing physical distancing requirements and many protesters are not wearing masks or face coverings, putting the public health at further risk." May 31 Order at 2. The June 1 order reiterated that "the District continues to be under a declared public health state of emergency due to COVID-19, and gatherings of more than ten (10) persons are currently prohibited in order to reduce the spread of the disease and to protect the public health." Mayor's Order at 2.

Plaintiffs point out that curbing gatherings during certain hours was unlikely to defeat the pandemic. *See* Surreply at 5 ("It is laughable, to say the least, that Defendants are now trying to claim that a two day curfew would somehow have solved the covid pandemic."). But plaintiffs' snide hyperbole does not accurately characterize the District's contention, and that is not the standard governing the constitutionality of the curfew in any event. This Court is only empowered to ask whether the interest "would be achieved less effectively absent the regulation." *Rock Against Racism*, 491 U.S. at 799. And given the "especially broad" latitude given to government officials "to act in areas fraught with medical and scientific uncertainties," *Marshall v. United*

*States*, 414 U.S. 417, 427 (1974), and the fact that the "Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect,'" *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020), quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905), the Mayor's findings suffice to show a nexus between human health and the curfew that provides additional support for its validity.[15]

The Court also finds that the Order was not broader than necessary because there were ample alternative channels available to plaintiffs. The curfews did not contemplate a complete bar on First Amendment activities; the May 31 Order stated that:

> For the past two nights, our police, and firefighters, and members of the public safety team for Washington, DC, along with our federal partners, have been working to make sure people may exercise their First Amendment rights, while not destroying Washington, DC.
>
> I recognize and empathize with the outrage that people feel following the murder of George Floyd in Minnesota last week. We are grieving hundreds of years of institutional racism - systems that require Black Americans to prove their humanity, just for it to be disregarded.

May 31 Order at 1. Under the June 1 Order, protesters were able to spread their message during the thirteen hours of the day not covered by the curfew, and this is a circumstance that has led other district courts to uphold similar curfews. *See, e.g.*, *In re New York City Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 413 (S.D.N.Y. 2021) ("That tailoring left protesters' First Amendment rights intact. Significantly, protesters were not restricted from gathering to exercise their First Amendment rights during the day. They were barred from the

---

15    The Court's review of the orders belies plaintiffs' assertion that protecting people from covid "was never even mentioned in the original reasons for the curfew," Surreply at 5, as COVID-19 was mentioned in both. *See* May 31 Order at 2; Mayor's Order at 2.

streets only between the hours of 11:00 PM on June 1, 2020, until 5:00 AM on June 2, 2020 [],
and between the hours of 8:00 PM and 5:00 AM from June 2 until June 7.").

Therefore, the Court finds that the curfew was narrowly tailored to further a significant
governmental interest and that Counts VI and VII must be dismissed for failure to state a claim.

### B.   Count VIII – the Equal Protection Clause

In Count VIII, plaintiffs complain that the officers did "not permit[] plaintiff[s] to
peaceably disperse prior to the time that" they were arrested, while "others accused of violating
the District of Columbia's curfew laws" were permitted to disperse.  Proposed Am. Compl. ¶ 46.
In particular, they assert that "[t]his treatment by the police is, of course[], in marked contrast to
the manner in which the individuals who invaded the United States Capitol on January 6, 2021
were treated."  Proposed Am. Compl. ¶ 8.

Though the Equal Protection Clause, by its terms, applies to states, "the Equal Protection
Clause of the Fourteenth Amendment applies to the District of Columbia through the Due Process
Clause of the Fifth Amendment."  *Dixon v. Dist. of Columbia*, 666 F.3d 1337, 1339 (D.C. Cir.
2011).  "To establish selective prosecution, [plaintiffs] must prove that (1) [they were] singled out
for prosecution from among others similarly situated and (2) that the prosecution was improperly
motivated, *i.e.*, based on race, religion or another arbitrary classification."  *Branch Ministries v.
Rossotti*, 211 F.3d 137, 144 (D.C. Cir. 2000) (citation, brackets, and internal quotation marks
omitted).  "This burden is a demanding one because 'in the absence of clear evidence to the
contrary, courts presume that government prosecutors have properly discharged their official
duties.'"  *Id.* (brackets omitted), quoting *United States v. Armstrong,* 517 U.S. 456, 464 (1996).

Here, plaintiffs do not support their conclusory allegation with any facts that would give
rise to a plausible claim that there were others who were similarly situated to them or that the

24

police officers named as defendants singled them out on an improper basis or even singled them out at all. The complaint contains no facts about anyone who protested on January 6th, let alone what they did on that date, what curfew was in place on January 6th, whether or when any individuals were observed to be in violation of it, or how they were treated by the officers. The reference to "people who invaded the Capitol" appears to relate to those who were inside the building, and not on a public street or park, and in any event, there is no time frame given for when the protesters were permitted to disperse on that date or where they were located at the time.[16]

Thus, plaintiffs' summary allegations are insufficient to state a plausible claim that they were similarly situated to anyone who protested in the middle of the day on January 6th. Moreover, Count VIII is a section 1983 claim brought against the individual arresting officers, and not against the District. And plaintiffs have not alleged that any of the individual defendants were at the Capitol on January 6th, or treated anyone differently at all, much less for an improper purpose. This is especially problematic when, as the D.C. Circuit has emphasized, proof of improper motivation is necessary to plead this claim. *See Branch Ministries*, 211 F.3d at 144.

---

[16]     Notwithstanding plaintiffs' breezy assertion that "it is undisputed, based on common knowledge . . . that both the plaintiff[s] and the insurrectionists who invaded the United States Capitol on January 6 were in public at a time when a District of Columbia curfew was in effect[,]" Opp. at 14, this is not "common knowledge" at all. It is a matter of public record that the Capitol was breached in broad daylight around 2:00 p.m., *see, e.g.*, *United States v. Chrestman*, 525 F. Supp. 3d 14, 19 (D.D.C. 2021) ("Shortly after 2:00 p.m., a violent mob of rioters 'forced entry' into the Capitol"), and that the Mayor imposed a twelve-hour curfew that began on January 6 at 6:00 p.m., *after* the Capitol was attacked. *See Mayor Bowser Orders Citywide Curfew Beginning at 6PM Today*, Government of the District of Columbia (Jan. 6, 2021), https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning-6pm-today. So it is not clear that anyone who was simply outside on the Capitol grounds was committing an offense at all, or that anyone who entered the closed building unlawfully and was directed to leave so that it could be secured – and the constitutionally mandated process of certifying the results of the 2020 election could resume – was similarly situated to plaintiffs who were protesting at 11:00 p.m. on a public street hours after a curfew took effect.

Plaintiffs' argument in response is that "it has not, at this time, been proven that [the arresting officer] was *not* involved in both incidents." Opp. at 14 (emphasis added). But this turns the inquiry on its head; defendants have no obligation to disprove facts that are not included in the complaint. Defendants have moved to dismiss under Rule 12(b)(6), and the Court is charged with assessing the sufficiency of the facts that plaintiffs have put forward. Because Count VIII is nothing more than a conclusory allegation supported by no facts, it will be dismissed.

### C. Proposed Amendments to the Complaint – Overbreadth and Vagueness

Plaintiffs propose to amend their complaints to add that "[t]he curfew law . . . is unconstitutional because it is vague," and that the "curfew law was unconstitutional because it was overbroad." Proposed Am. Compl. ¶¶ 12–13. Plaintiffs seek to incorporate these theories into six counts notwithstanding the fact that only two of them invoke the First Amendment. *See* Proposed Am. Compl. ¶¶ 17 (Count I), 26 (Count III), 31 (Count IV), 34 (Count V), 38 (Count VI), and 42 (Count VII).

The vagueness and overbreadth doctrines are related concepts, and their application depends upon the impact of the particular order or regulation in question on conduct covered by the First Amendment. The Supreme Court has instructed that:

> In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail. The court should then examine the facial vagueness challenge.

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494–95 (1982) (footnotes omitted).

A "showing that a law punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep,' suffices to invalidate *all* enforcement of that law,

26

'until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.'" *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003), quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 615 (1973) (emphasis in original).  The overbreadth doctrine is an "expansive remedy out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions." *Id.* at 119.

The Mayor's Order did not punish a substantial amount of expressive conduct in relation to its plainly legitimate sweep, and therefore, it was not overbroad.  The curfew applied to anyone who was out and about within the defined times; as the Supreme Court put it when considering a trespass statute in *Hicks*, the law would "apply to strollers, loiterers, drug dealers, roller skaters, bird watchers, soccer players, and others not engaged in constitutionally protected conduct—a group that would seemingly far outnumber First Amendment speakers." 539 U.S. at 123.  Indeed, the Supreme Court noted, "[r]arely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." *Id.* at 124; *see also Broadrick*, 413 U.S. at 612 (explaining that the overbreadth doctrine is most often invoked in "cases involving statutes which, by their terms, seek to regulate 'only spoken words.'").  This is not that rare case, as this statute has a wide, plainly legitimate sweep, and it is not primarily directed towards protected speech.

That brings the Court to the vagueness doctrine.  "The Due Process Clause protects individuals from laws that are so vague that they cannot be understood with reasonable consistency—whether by the people who must obey the law or the officials charged with applying it." *Agnew v. Gov't of the Dist. of Columbia*, 920 F.3d 49, 55 (D.C. Cir. 2019).  Laws can be constitutionally infirm and void for vagueness in two ways:  if they fail to provide fair notice of

what is prohibited, or if the language is so broad that it encourages arbitrary and discriminatory enforcement. *Id.*

Traditionally, to succeed on a facial vagueness challenge, a plaintiff had to show that "the enactment [was] impermissibly vague in all of its applications." *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 735 (D.C. Cir. 2016), quoting *Hoffman*, 455 U.S. at 495. That rule was grounded in the notion that a "plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 20 (2010), quoting *Hoffman*, 455 U.S. at 495. The Supreme Court, however, recently expressed some skepticism about that framework, noting that its prior holdings "squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson v. United States*, 576 U.S. 591, 602 (2015).

Since that time, the D.C. Circuit has held that the guidance set forth in *Holder* does not apply to a vagueness challenge to a statute premised on the argument that the statute encourages arbitrary and discriminatory enforcement. *See Act Now to Stop War & End Racism Coal. v. Dist. of Columbia*, 846 F.3d 391, 410 (D.C. Cir. 2017). "A law invites arbitrary and discriminatory enforcement when 'there are no standards governing the exercise of the discretion' it grants." *Agnew*, 920 F.3d at 55, quoting *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972). "This category includes laws whose application turns on subjective judgments or preferences either of officers or of third parties." *Id.* But a law may "require law enforcement officers to use their discretion without being unconstitutionally vague" because "[e]nforcing criminal laws necessarily 'requires the exercise of some degree of police judgment.'" *Id.*, quoting *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972).

28

Plaintiffs complain about the Order on both grounds.  They argue first that the Order is unconstitutionally vague "because it prohibits loitering," and "[t]he term loitering . . . cannot be readily defined and . . . fails to give a person of ordinary intelligence fair notice that his or her contemplated conduct is forbidden by statute."  Proposed Am. Compl. ¶ 12.

The mere use of the word "loiter" in the list of prohibited activities does not make the Order unfairly vague.  The word itself is not antiquated or obscure; it appears without definition elsewhere in the D.C. Code, *see, e.g.,* D.C. Code § 32-221, and its general meaning is commonly understood.  *See, e.g.*, *Loiter*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/loiter (last visited March 28, 2022) (defining the term as "to remain in an area for no obvious reason," "to lag behind," or "to delay an activity with idle stops and pauses").  But even if the familiar term is not sufficiently specific to delineate the boundaries of prohibited conduct when standing alone, here it is part of a series, and it gains meaning from that context: "no person . . . shall walk, bike, run, loiter, stand, or motor by car or other mode of transport upon any street, alley, park, or other public place within the District."  Mayor's Order at 2; *see Agnew*, 920 F.3d at 56 (emphasizing that words in the incommoding statute should be "read together in context").[17]

A person of ordinary intelligence had fair notice and could easily ascertain that the curfew was a curfew; no person could be in any "public place within the District" during the hours it was in force.  If anything, the inclusion of the word "loiter" served to put people on notice that they were prohibited from being outside doing *anything*, even just standing around.  As the government

---

17      The Supreme Court has made clear that "[i]t is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'"  *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000), quoting *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989).

puts it, during the times indicated by the curfew, "there was no 'criminal' loitering or standing that could be confused with 'innocent' loitering or standing." Reply at 4.

Plaintiffs also assert that the term loitering is vague "because it fails to create an ascertainable standard of guilt and would encourage arbitrary and erratic arrest and convictions to the extent that an individual could be arrested simply for behavior which a police officer considered to be an affront to police authority." Proposed Am. Compl. ¶ 12. But when the Supreme Court found a loitering statute to be constitutionally infirm, it made it quite clear that the problem was not the use of the verb: "the vagueness that dooms this [loitering] ordinance is not the product of uncertainty about the normal meaning of 'loitering,' but rather about what loitering is covered by the ordinance and what is not." *City of Chicago v. Morales*, 527 U.S. 41, 57 (1999). In that case, the municipality supplied a definition for the term – "to remain in any one place with no apparent purpose" – and the Court concluded that while "the term 'loiter' may have a common and accepted meaning," the ordinance's definition of that term did not. *Id.* at 56. It was the use of the word "apparent" that made the officer's subjective judgment – and not the nature of the conduct – the determining factor, and that was the flaw that facilitated discriminatory enforcement and offended the Constitution. *Id.* at 61–63.

By contrast, the D.C. Mayor's Order was absolute and unequivocal. The plain terms of the ordinance could be enforced against anyone who was in any public place during the designated hours and was not subject to any of the delineated exceptions. Mayor's Order at 2. The list of prohibited activities does not call for any "subjective judgments or preferences either of officers or of third parties," *Agnew*, 920 F.3d at 55; the only question is whether a person is in a public place during the prohibited hours.

Because the order is easily understood and it does not encourage arbitrary or discriminatory enforcement, it is not void for vagueness.  For that reason, amending the complaint to add the overbreadth and vagueness theories to multiple counts would be futile.

### D.  Counts I and IV – False Arrest

Count I asserts a claim of false arrest against the individual officers, *e.g.*, Proposed Am. Compl. at 6 (identifying Luke Choi), and the District of Columbia is named as a defendant under the doctrine of respondeat superior.  Proposed Am. Compl. ¶ 19.  Count IV, brought via 42 U.S.C. § 1983 and only against individual officers, also asserts that plaintiffs were arrested without probable cause in violation of the Fourth Amendment.  Proposed Am. Compl. ¶ 27.[18]

"Common-law and constitutional claims of false arrest are generally analyzed as though they comprise a single cause of action."  *Dingle v. Dist. of Columbia*, 571 F. Supp. 2d 87, 95 (D.D.C. 2008), citing *Scott v. Dist. of Columbia,* 101 F.3d 748, 753–54 (D.C. Cir. 1996).  "The elements of a constitutional claim for false arrest are substantially identical to the elements of a common-law false arrest claim."  *Scott*, 101 F.3d at 753; *see also Dist. of Columbia v. Minor*, 740 A.2d 523, 531 (D.C. 1999) (false arrest "standard resembles the section 1983 probable cause and qualified immunity standards discussed above (with the added clear articulation of the requirement of good faith)").

"To avoid liability for common law false arrest, a police officer may justify an arrest by demonstrating either (1) that he or she had probable cause to make the arrest or (2) that he or she believed in good faith that the arrest was lawful and that this belief was reasonable."  *Minor*, 740 A.2d at 531.  Similarly, Fourth Amendment false arrest claims are defeated by a showing of

---

18     The proposed amended complaint labels this paragraph twenty-seven, but it comes after paragraph thirty and the next paragraph is labeled paragraph thirty-one.

probable cause. *Dellums v. Powell*, 566 F.2d 167, 175 (D.C. Cir. 1977) ("The focal point of the action is the question whether the arresting officer was justified in ordering the arrest of the plaintiff; if so, the conduct of the arresting officer is privileged and the action fails. . . . Justification can be established by showing that there was probable cause for arrest of the plaintiff on the grounds charged.").

"A police officer has probable cause . . . when the facts available to [the officer] would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013). "Probable cause is more than bare suspicion but is less than beyond a reasonable doubt and, indeed, is less than a preponderance of the evidence." *United States v. Burnett*, 827 F.3d 1108, 1114 (D.C. Cir. 2016). "Probable cause is an objective standard 'to be met by applying a totality-of-the-circumstances analysis.'" *Id.*, quoting *United States v. Vinton*, 594 F.3d 14, 21 (D.C. Cir. 2010).

Plaintiffs' initial contention is that there was no legal justification for their arrests because the statute was not only unconstitutional, but so clearly so that the officers could not rely on it in good faith. Opp. at 8–9. But this Court has already found that the Mayor's order was constitutionally valid, so the only remaining question is whether the officers had probable cause to arrest the plaintiffs for violating it at the time. And the answer can be found on the face of the complaints: each complaint specifically alleges that plaintiffs were standing in a public place within the District at 11:00 p.m. on June 1, 2020. *See* Proposed Am. Compl. ¶ 7 ("On or about June 1, 2020, at approximately 11:00 p.m., while at or near the 1400 block of Swann Street, N.W., plaintiff was standing with a group of like-minded citizens protesting the treatment of African American citizens by the police."); *see also* Opp. at 3 ("at approximately 11:00 p.m.," plaintiffs were "standing with a group . . . protesting the treatment of African-American citizens by police"

32

"at or near the 1400 block of Swann Street, N.W. . . . near Lafayette Park in front of the White House.").[19]  Plaintiffs' admitted actions at that hour were prohibited by the plain terms of the curfew order, *see* Mayor's Order at 2 ("During the hours of the curfew, no person . . . shall walk, bike, run, loiter, stand, or motor by car . . . upon any street, alley, park, or other public place within the District."), so the facts before the Court support a finding that there was probable cause for the arrests.

Though the complaints establish that officers observed plaintiffs violating the curfew, plaintiffs also argue that, even if the law was constitutional, reasonable officers could not have concluded from the totality of the circumstances that there was probable cause to believe they had committed a crime because plaintiffs were "not violating the law at the time [they were] arrested, but, rather, trying to comply with it."  Opp. at 10; *see also* Proposed Am. Compl. ¶ 8.  Plaintiffs maintain, without citing any legal authority, that "[i]n such a case where a police officer, himself, has prevented an individual from complying with the law, plaintiff[s] can not be said to have committed a crime and [the arresting officer] could not have had a good faith belief that plaintiff had committed a crime."  Opp. at 10 (emphasis removed).  They add:

> Should defendants contend that plaintiff should not have been on the street at all [] or near the time of the curfew, this argument, too, would lack any merit since it would not have been illegal to be on the street prior to the time that the curfew went into effect and, if the law is to be given any common sense application at all, any individual who is on the street at the moment the curfew becomes effective should, at the very least, as a practical matter, be given the opportunity to be able to leave in order to comply with the law.

---

19      The Court accepts the assertion in the complaint that plaintiffs were in the 1400 block of Swann Street, NW as true, but it need not accept the geographically inaccurate statement in the opposition that this placed them "near Lafayette Park in front of the White House."  Opp. at 3.  But whether they were on Swann Street or a mile away at the White House, the plaintiffs were in a public place in the District at a time when the curfew was in force.

Opp. at 10–11. Plaintiffs fail to provide any authority for this long-winded proposition either, but even if one were inclined to agree with it, it has absolutely nothing to do with the particular complaints that are the subject of the pending motions to dismiss.

The curfew went into effect at 7:00 p.m., and the plaintiffs allege that they were arrested on the streets of the District four hours later. They do not allege that they were rounded up at or just before 7:00 p.m. – or even five, ten, or even thirty minutes later. They simply allege that they attempted to leave at some unspecified time "prior to" their arrest. This does not negate the presence of probable cause.

Whatever the wisdom of the curfew, or of the decision to enforce it – at least in part – by arresting peaceful protesters, these plaintiffs do not state a claim that they were arrested without probable cause. Therefore, Counts I and IV in these complaints must be dismissed.

### E. Counts II, III, and V – Assault and Battery and Excessive Force

Counts II and III are brought against the individual officers and the District and they allege that the officers and the District, as their employer, are liable for both assault and battery for the officers' actions at the time of plaintiffs' arrests. *See* Proposed Am. Compl. ¶¶ 21–29. Count V is brought against the individual officers only under section 1983, and it seeks damages for an alleged violation of the Fourth Amendment because plaintiffs were arrested with excessive force. *See* Proposed Am. Compl. ¶ 34. Because these claims all implicate the manner in which plaintiffs were arrested, the Court will address them together.

Generally, "[a]n assault is 'an intentional and unlawful attempt or threat, either by words or acts, to do physical harm to the plaintiff.'" *Smith v. Dist. of Columbia.*, 882 A.2d 778, 787 (D.C. 2005). "In contrast, 'a battery is an intentional act that causes a harmful or offensive bodily contact.'" *Id.*

34

But here, plaintiffs allege that they were assaulted by police officers. "A police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not 'in excess of those which the actor reasonably believes to be necessary.'" *Holder v. Dist. of Columbia*, 700 A.2d 738, 741 (D.C. 1976); *see also Dist. of Columbia v. Chinn*, 839 A.2d 701, 706 (D.C. 2003) ("Strictly speaking, a police officer effecting an arrest commits a battery. If the officer does not use force beyond that which the officer reasonably believes is necessary, given the conditions apparent to the officer at the time of the arrest, he is clothed with privilege.").

Excessive force claims under section 1983 and the Fourth Amendment are "properly analyzed under the Fourth Amendment's objective reasonableness standard, which tracks the constitutional text by asking whether the force applied was reasonable." *Johnson v. Dist. of Columbia*, 528 F.3d 969, 973 (D.C. Cir. 2008) (citations and internal quotation marks omitted). In asking whether force was "reasonable," the Court considers "such factors as the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of injury inflicted." *Id.* at 974 (citation and brackets omitted). The Court must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* And even if there is a constitutional intrusion, officers may still be entitled to qualified immunity under the same standard outlined above.

The Court has already determined that plaintiffs' arrests were supported by probable cause; as a result, the assault and battery claims can only proceed if the means employed to effect the arrests were excessive, making both counts overlap substantially with the excessive force claim. But plaintiffs' complaints are wholly lacking in any non-conclusory allegations regarding the arrests.

Paragraph eight in the facts section of the proposed amended complaint asserts that the officers "had no lawful authority" to arrest the plaintiffs, but it does not describe the means that were used to accomplish the arrests or make any assertions whatsoever about any force that was applied at the time.  *See* Proposed Am. Compl. ¶ 8.

Paragraph nine then alleges:

> At the time that plaintiff was arrested, plaintiff was transported to the Blue Plain Police Academy where plaintiff was held with plaintiff's hands behind plaintiff's back until plaintiff was arraigned and released the next morning. This conduct was clearly excessive because Officer Choi had no legal justification for touching plaintiff and also because plaintiff was held overnight with plaintiff's hands handcuffed behind plaintiff's back.

Proposed Am. Compl. ¶ 9.

Count II – assault – consists of four paragraphs.  Proposed paragraph twenty-one incorporates the prior paragraphs, but those are devoid of factual allegations concerning the arrest. *See* Proposed Am. Compl. ¶ 21.  Paragraph twenty-two states that "[t]he Defendant police officer assaulted plaintiff by causing plaintiff to reasonably apprehend that plaintiff would be subjected to imminent harmful and offensive contact."  Proposed Am. Compl. ¶ 22.  Paragraph twenty-three asserts that the District is liable for actions taken by individual officers under the doctrine of respondeat superior.  Proposed Am. Compl. ¶ 23.  And paragraph twenty-four states "[a]s a result of the false arrest, plaintiff suffered the loss of plaintiff's liberty and experienced severe mental and emotional distress."  Proposed Am. Compl. ¶ 24.

Since it is well established that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678, this claim must be dismissed against all defendants.

36

Count III – battery – also consists of five conclusory paragraphs. Proposed paragraph twenty-five incorporates the prior paragraphs, which do not mention how any plaintiff was handled during their arrests. Proposed Am. Compl. ¶ 25. Paragraph twenty-six asserts that there was "no legal justification for touching plaintiff because the curfew law . . . was vague and overbroad." Proposed Am. Compl. ¶ 26. Paragraph twenty-seven states that the officer "touch[ed] plaintiff without plaintiff's consent." Proposed Am. Compl. ¶ 27. Paragraph twenty-eight asserts that the District is liable for actions taken by individual officers under the doctrine of respondeat superior. Proposed Am. Compl. ¶ 28. And paragraph twenty-nine states that "plaintiff suffered the loss of plaintiff's liberty and Experienced severe mental and emotional distress." Proposed Am. Compl. ¶ 29. Since this Count fails to include a single factual allegation and merely recites the elements of battery, it also must be dismissed against all defendants.[20]

Count V suffers from the same defects. Proposed paragraph thirty-three incorporates the previous paragraphs. Proposed Am. Compl. ¶ 33. Paragraph thirty-four states that arrests effectuated with "excessive force" violate the Fourth Amendment, adding that this right was "clearly established [] at the time [that] plaintiff was arrested." Proposed Am. Compl. ¶ 34. At this point, plaintiff repeats a paragraph number; the second proposed paragraph thirty-four states that the officer violated plaintiffs' rights "by using excessive force during the [course] of an arrest

---

[20]    In its reply in support of its motion to dismiss, the District points the Court to *Barham v. Ramsey*, 338 F. Supp. 2d 48, 67 (D.D.C. 2004), *aff'd in part*, 434 F.3d 565 (D.C. Cir. 2006). In that case, the court observed: "[i]t is undoubtedly reasonable to handcuff arrestees during a mass arrest, especially when they are being transported via an unsecured bus to a holding facility. Moreover, due to the lack of clearly established law in this Circuit or other circuits, the Court cannot find that it would 'be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.*, quoting *Groh v. Ramirez,* 540 U.S. 551, 563 (2004). Since the complaints here are too conclusory to state a claim, the Court need not determine if it agrees with the *Barham* court on the merits.

and by touching plaintiff without having any legal justification for doing so." Proposed Am. Compl. ¶ 34. And paragraph thirty-five adds that "plaintiff experienced pain and suffering and experienced severe mental and emotional distress" as a result of this arrest. Proposed Am. Compl. ¶ 35. The Court has already found that the arrests were legally justified; since the complaints do not allege any facts to support the notion that officers used more force than was necessary to effectuate the arrests, Count V also must also be dismissed.[21]

### CONCLUSION

Plaintiffs have failed to state a claim upon which relief can be granted, and their proposed amendments to the complaint would be futile as plaintiffs still would not state a claim. Therefore, the motions to dismiss will be **GRANTED** and the motions to amend will be **DENIED**.

Separate orders will issue in each individual case.

AMY BERMAN JACKSON
United States District Judge

DATE: March 28, 2022

---

[21] The complaint does provide some detail concerning the conditions of plaintiffs' detention overnight. *See* Proposed Am. Compl. ¶ 9 ("At the time that plaintiff was arrested, plaintiff was transported to the Blue Plain Police Academy where plaintiff was held with plaintiff's hands behind plaintiff's back until plaintiff was arraigned and released the next morning."). This is similar to an issue addressed in *Barham*, 338 F. Supp. 2d at 67–68; there, the district court was asked to grant judgment in defendants' favor on a claim alleging that the somewhat different conditions of the plaintiffs' detention – the overnight use of flexi-cuffs to cuff one wrist to the opposite ankle – violated their constitutional rights. The Court ruled in favor of the District, but the issue was presented in a motion for summary judgment, and the court had the benefit of a full record to consider. That difference is of little moment here, though, because the complaints in these cases contain no such claim; Counts II and III allege assault and battery at the time of arrest and Count V alleges the use of excessive force at the time of arrest, and even the proposed amended complaint does not take on the conditions of the plaintiffs' confinement.